FLORIDA POWER CORPORATION, a corporation organized and existing uder the laws of the State of Florida, v. CITY OF TALLA-HASSEE, a municipal corporation organized and existing under the laws of the State of Florida.

18 So. (2nd) 671                    June Term, 1944
June 27, 1944                     Special Division B

E. E. Fenderson, Caldwell & Parker, Millard Caldwell, Julius F. Parker and Leo L. Foster, for appellant.

James Messer, Jr., for appellee.

CHAPMAN, J.:

The City of Tallahassee and the Florida Power Corporation, on August 25, 1936, entered into a contract for the purchase and sale of electric energy. This contract was to remain in force and effect and binding upon the parties for a period of twenty years, with optional extension privileges in behalf of the city. Article 1 of the contract made it the duty of the power company to maintain two separate and independent transmission lines and two independent sources of electrical energy. The parties will be referred to hereinafter as the city and the power company.

Article 2. The city grants to the power company easement over the streets and city property necessary to the transmission of the electric energy and the use of the city's substation within the city. Article 3 provides for the removal, within four months after the termination of the contract, all property of the power company from the streets and property of the city. Article 4 binds the city not to generate energy or purchase it elsewhere except when the power company was unable to furnish it or refused, without

legal excuse, so to do. Article 5 provides for the price or amount to be paid for electric energy by the city to the power company so consumed by it or by the city sold to its customers.

Article 6 provides for the delivery to the city of the energy, its measurements, and other items not material to a disposition of the case at bar. Article 7 makes it the duty of the power company to render statements to the city each month for electric energy delivered. Article 8 provides that in emergencies the city may generate with its equipment electric energy. The ownership of generating units by the city in no manner affects the penalties imposed by the city for its failure to supply the energy as required by the terms of the contract. Article 9 fixed the liability of the city and the power company for injuries to persons and property while operating under the several provisions of the contract. Articles 10 and 11 are not material or pertinent for a consideration and ruling on the facts in this controversy.

Pertinent provisions of the contract are found in Article 12, which is viz:

"Article 12. The service which the company agrees to furnish to the city shall be continuous and uninterrupted, and both of the company's said sources of electric energy shall be kept available for such purpose, unless the company is prevented from delivering electric energy hereby agreed to be furnished by the Act of God, or cause or causes beyond its control, or by any emergency in which the company may be compelled to act to prevent injuries to life, person or property of another, but where flood or drought is claimed to be an act of God, it shall not be excused where the same could have been reasonably anticipated and provided against, but even where interruptions are excused by act of God or for causes beyond the control of the company, the company shall be diligent in restoring its service after any such interruption, and if such service can be continued from any of the sources of electric energy available to the company, the same shall be promptly resorted to and electric energy supplied therefrom, and the company agrees to keep such sources of electric energy immediately available to meet any

such emergency, and interrupted service shall be excused only until the company by the exercise of such diligence as the emergency demands can make available any of its sources of electric energy and deliver the same to the city.

"It is agreed by the company that when the voltage falls below twenty-one (2100) volts for a continuous period of more than fifteen (15) minutes, the service shall be considered and treated as interrupted service and shall come within the penalties herein provided for such service. The city shall install recording volt meters of a standard make at the point of delivery to determine voltage and show interrupted service, and the records made by these instruments shall be controlling. The company will have the privilege of testing these instruments at any time, provided the city manager or other authorized representative of the city is present.

"The company shall use due and reasonable diligence to provide a regular and uninterrupted supply of electric energy, but in case such supply shall be interrupted or be defective or fail for any cause, it shall be required to exercise all reasonable diligence in order to resume the normal supply of electric energy as quickly as practicable, but in any event it is mutually agreed that failures of energy or power shall be within the following limits, to wit: Interruptions not exceeding ten (10) consecutive minutes, or a total of thirty (30) minutes in any two (2) calendar days during any month, or total of two (2) hours during any month shall be disregarded. Should the said total exceed two (2) hours in any month, however, the company agrees to pay the city as liquidated damages, an amount equal to the amount which will be due the company by the city to be determined as follows: The quantity of energy to be estimated on the basis of the energy consumed during the same hour or hours of the previous day or days at the average cost rate for the month in which said interruption or interruptions occur multiplied by the following factors: (If interruptions occur during the same hour or hours on successive days, the quantity of energy to be estimated and determined on the basis of the energy consumed during the same hour or hours on the last day or days previous in which no interruption or interruptions occurred.)

|                                              | Factor |
|----------------------------------------------|--------|
| Total of two hours in one month              | 0      |
| Total of two to three hours in one month     | 2      |
| Total of three to four hours in one month    | 5      |
| Total of four to six hours in one month      | 10     |
| Total of six to eight hours in one month     | 15     |
| All over eight hours in one month            | 20     |

It is further agreed that should the said interruptions exceed a total of twelve (12) hours per month for any two consecutive months, and said interruptions, defects or failures result from the company's negligence, the city may terminate this agreement by ninety (90) days' written notice to the company, and at the expiration of the said ninety (90) days period, all rights of the company under this contract shall cease, and the company shall within thirty (30) days thereafter begin the removal of all its physical property situated in the City, as provided for in Article III hereof."

A recital of the contents of Articles 13, 14, 15, 16, 17 and 18 of the contract is unnecessary for a ruling on or a disposition of this controversy.

The record reflects that on October 7, 1941, early in the morning, a hurricane blowing up from the Gulf of Mexico, struck Tallahassee and environs. The wind reached a high velocity, rain or sheets of water, accompanied the wind, and these natural elements continued, without serious interruption, for several hours and extended over a large and broad area about the City of Tallahassee and beyond. The equipment and facilities of the power company used in the generation of electric energy were so affected by the hurricane that it failed and omitted to deliver to the City of Tallahassee the required electric energy on October 7, 1941, for a period of 10.2 hours as required by the terms of its contract with the City of Tallahassee. The formula fixing the penalties for the "outage" embodied in the contract, when translated into money, approximates the sum of $2,659.83, and said sum was by the city deducted from the amount due the power company. The power company protested the action of the city and asserts that the unlawful deductions cannot be sustained by the terms of the contract.

Section 62.09, Fla. Stats. 1941 (F.S.A.), in part, provides that any person or corporation claiming an interest under a deed, will, contract in writing, or other instrument in writing, may apply by bill in chancery to any court in this State having equity jurisdiction for the determination of any question of construction arising under the instrument and for a declaration of the rights of persons or corporations interested, whether or not further relief is or could be claimed, and such declaration shall have the force and effect of a final decree in chancery. . . . This statute has been before the court on many occasions. See Sheldon v. Powell, 99 Fla. 782, 128 So. 258; Woodman v. Jones, 101 Fla. 177, 133 So. 620; Southern Food Stores, Inc. v. Palm Groceries, Inc., 134 Fla. 838, 184 So. 502; Griley v. Rackley, 135 Fla. 829, 185 So. 734; Mayfair Operating Corp. v. Bessemer Properties, Inc., 150 Fla. 132, 7 So. (2nd) 342; Lippman v. Shapiro, 151 Fla. 327, 9 So. (2nd) 636, and similar cases.

Pursuant to the authorities cited, *supra,* the power company by bill in chancery applied to the Circuit Court of Leon County, Florida, for a declaratory judgment, thereby adjudicating the rights of the parties under the several terms of the contract. The facts involved are not seriously controverted. An answer to the bill of complaint was filed by the city. The point of clearage between the parties is whether Article 12, and other pertinent provisions *supra,* of the contract authorizes the city to deduct $2,659.83 as "outage" from the amount it was due the power company for electric energy for October, 1941. The power company's construction of the pertinent provisions of the contract is that the "outage" was caused by Acts of God, or from a cause or causes beyond its control. The chancellor on final hearing on bill and answer held that the power company was not relieved from liability for the "outage" even caused by Acts of God or cause or of causes beyond its control. The power company appealed.

The courts have established rules to be observed in the construction of contracts. One requires that the contract should be considered as a whole in determining the intention of the parties to the instrument. Another is to the effect that the conditions and circumstances surrounding the parties

and the object or objects to be obtained when executing the contract should be considered. Another is that courts should place themselves, as near as possible, in the exact situation of the parties to the instrument, when executed, so as to determine the intention of the parties, objects to be accomplished, obligations created, time of performance, duration, consideration, mutuality, and other essential features. See Orlando Orange Grove Co. v. Hales, 119 Fla. 159, 161 So. 284; Bennett v. Williams, 149 Fla. 4, 5 So. (2nd) 51; Knabb v. Reconstruction Finance Co., 144 Fla. 110, 197 So. 707.

If clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible. If one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would be in accord with reason and probability. See Hull v. Burr, 58 Fla. 432, 50 So. 754. If the language of a contract is contradictory, obscure or ambiguous, or where its meaning is doubtful so that it is susceptible of two constructions, one of which makes it fair, customary, and such as a prudent man would naturally execute, while the other interpretation would make it unequitable, unnatural, or such as a reasonable man would not be likely to enter into, then the reasonable, logical and rational interpretation should be adopted. See Holmes v. Kilgore, 89 Fla. 194, 103 So. 825; Ross v. Savage, 66 Fla. 106; 63 So. 148; Durham Tropical Land Corp. v. Sun Garden Sales Co. 106 Fla. 429, 138 So. 21, 143 So. 758. In 17 C.J.S. 726, par. 309, the rule is stated viz: "Inconsistent and conflicting clauses must be construed so as to effectuate the intention of the parties as gathered from the entire instrument, and apparently conflicting provisions reconciled, if possible. The clause contributing most essentially to the contract is entitled to the greater consideration; but if two clauses are so repugnant that they cannot stand, the first ordinarily will prevail over the second." Likewise, 12 Am. Jur. 778, par. 243, states: "It has been laid down as elementary law that if two clauses of an agreement are so totally repugnant to each other that they cannot stand together, the first shall be received and the latter rejected."

See Williston on Contracts, Vol. 3 (Rev. Ed.) 1795, par. 624.

The *prior clause* of Article 12 of the contract makes it the duty of the power company to furnish to the city continuous and uninterrupted service of electric energy from both sources which shall be available for such purpose, unless the power company is prevented from delivering electric energy . . . by the Act of God or cause or causes beyond its control or by an emergency in which the company may be compelled to act to prevent injuries to life, person or property of another, but where drought or flood is claimed to be an Act of God it shall not be excused where the same could have been reasonably anticipated and provided against.

A *subsequent clause* of Article 12 of the contract provides that the power company shall use due and reasonable diligence to provide a regular and uninterrupted supply of electric energy, but in case such supply shall be interrupted or be defective *or fail for any cause,* it shall be required to exercise all reasonable diligence in order to resume the normal supply of electric energy as quickly as practicable but in any event it is mutually agreed that failure of energy shall be within the limits viz:

The cause for not supplying the electric energy on October 7, 1941, as provided for, was due and directly traceable to the hurricane that affected the facilities and equipment of the power company and rendered it impossible to supply or deliver to the city energy for 10.2 hours. It is not disputed that the hurricane struck Tallahassee and vicinity or that the equipment and facilities of the power company were disorganized for the period. The only justifiable reason for not delivering the electric energy is when so prevented by an Act of God. The city contends that the Act of God provisions are inapplicable to the third paragraph of Article 12 of the contract. The law makes a part of the subsequent paragraphs of Article 12 of the contract a justification for non performance or failure to deliver to the city electric energy, the Acts of God or cause or causes beyond the control of the power company. See Moon v. Wilson, 100 Fla. 791, 130 So. 25 Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422; 17 C.J.S. 955.

Legal justification for nonperformance of a contract is treated in 12 Am. Jur. 939, thusly:

"To excuse nonperformance of a contract on the ground of an act of God, there must, even in the absence of statutory provisions, be no admixture of negligence or want of diligence, judgment, or skill on the part of the promisor. An act of God, such as will excuse nonperformance of a legal contract, must be an act or occurrence so extraordinary and unprecedented that human foresight could not foresee or guard against it, and the effect of which could not be prevented or avoided by the exercise of reasonable prudence, diligence, and care or by the use of those means which the situation of the party renders it reasonable that he should employ. It must be the sole proximate cause of the nonperformance, without the participation of man, whether by active intervention or negligence or failure to act. When performance becames impossible by reason of contingencies which should have been foreseen and provided against in the contract, the promisor is held answerable. Accordingly, a seasonable event, one which is likely to happen and which common prudence would provide for, is not such an extraordinary event as will constitue an act of God excusing nonperformance. . . ."

We therefore conclude that the hurricane visiting the City of Tallahassee and vicinity on October 7, 1941, for a period of several hours which disorganized and affected the equipment and facilities of the power company and thereby prevented a delivery to the City of electric energy for 10.2 hours, in light of the cited authorities, was an Act of God and a legal justification for the non delivery for the period of the energy as provided for by the terms of the contract.

On cross assignment, authorized by Subsection (c) of Rule 11 of the Supreme Court of Florida, effective April 12, 1942, counsel for appellee challenges on this appeal an order of the lower court dated September 4, 1942, striking paragraph 5 of the answer of the City of Tallahassee. Careful consideration has been given to the contents of the stricken portion of the answer. It is difficult to appreciate the relevancy of materiality of the allegations of the stricken por-

tion of the answer as applicable to the allegations of the bill of complaint. Our statutes and decisions authorized the application of the plaintiff below to a court of equity for a declaratory decree. The point in controversy as made by the allegations of the bill of complaint seeking the declaratory judgment based on the contract of the parties was whether the power company was due the City of Tallahassee the sum of $2,659.83 for "outage" of electric energy for 10.2 hours caused by the hurricane occurring on October 7, 1941. The stability of the collections by the City from the sale of energy so supplied and the budgeting of the same and other matters appearing in the stricken portion of the answer certainly were not responsive, material or relevant to the material allegations of the bill of complaint. The order of the lower court dated September 4, 1942, is free from error.

This cause was submitted to the chancellor below on final hearing on the bill of complaint as amended and the answer of the defendant as amended, as authorized by Section 63.40 Fla. Stats. 1941 (F.S.A.). The parties below did not offer evidence in support of the issues presented by the pleadings, but the contract providing for the purchase and sale of electric energy out of which this controversy arose was properly before the lower court when his final decree was entered. Placing the cause on final hearing on bill and answer under the rule *supra,* necessarily limits or restricts the issues.

When considering this identical question in the case of Stoltenberg v. Hughes, a recent but unreported case (opinion filed June 16, 1944), in part, we said:

"It is settled law that on a hearing on bill and answer, after the time for taking testimony has expired, every allegation in the answer responsive to the bill of complaint is taken as true if there is only the bill and answer before the Court, and, if the answer denies all the material allegations of the bill, the issues are made by the denials, and a final decree should be entered against the party having the burden of proof. See Davis v. Wilson, 139 Fla. 698, 190 So. 716. Averments of an answer responsive to the bill by way of avoidance must be proven by defendant. Whitaker v. Eddy,

109 Fla. 535, 147 So. 868. Allegations in an answer responsive to the bill on final hearing on bill and answer, are accepted as true. Watson v. Blair, 73 Fla. 255, 74 So. 317."

The final decree appealed from is reversed, with directions for further proceedings in the lower court, not inconsistent with the views herein expressed.

It is so ordered.

BUFORD, C. J., BROWN and THOMAS, JJ., concur.